No. 2561

Second Circuit

---

## OSWEGO STATE BANK v. MAURER

---

(April 8, 1927. Opinion and Decree.)
(May 13, 1927. Rehearing Refused.)
(July 12, 1927. Writ of Certiorari and Review Denied by Supreme Court.)

---

(*Syllabus by the Court*)

1. Louisiana Digest—Bills and Notes— Par. 116, 128.

The maker of a negotiable instrument is cut off from all equities as between himself and the original holder when such instrument has passed into the hands of third persons in due course.

2. Louisiana Digest—Bills and Notes— Par. 183, 184, 189.

The payment of a debt evidenced by a negotiable instrument by the principal debtor to a holder in due course discharges the instrument.

3. Louisiana Digest—Bills and Notes— Par. 185, 189.

Where a holder in due course of original drafts subsequently accepts new or substitute draft in lieu of the original and collects the new or substitute drafts when due, and applies the proceeds to the payment of the debt, the original drafts are discharged.

4. Louisiana Digest—Bills and Notes— Par. 130, 199.

Where two negotiable instruments are identical except as to date of issue and date of maturity, both issued to represent the same debt, the one issued as a substitute for the other, the holder of both, who has knowledge of the facts, can collect one but not both of the drafts, where consideration was paid for only one.

5. Louisiana Digest—Bills and Notes— Par. 233, 236.

Evidence held to show that plaintiff in possession of two drafts paid consideration for only one, had knowledge that the second draft was issued as a substitute for the first and accepted the second draft with knowledge of all the circumstances, and collected the second draft, the proceeds of which paying in full the debt due to it by the principal debtor.

Appeal from First Judicial District Court of Louisiana, Parish of Caddo. Hon. T. F. Bell, Judge.

Action by Oswego State Bank against Mrs. L. M. Maurer.

There was judgment for plaintiff and defendant appealed.

Judgment reversed and suit dismissed.

Barksdale, Bullock, Warren, Clark & Van Hook, of Shreveport, attorneys for plaintiff, appellee.

Frank J. Lowney, of Shreveport, attorney for defendant, appellant.

ODOM, J. This is a suit on a negotiable instrument in the form of a draft for acceptance, drawn by the Pearl Roller Mill Company, on the defendant, Mrs. L. M. Maurer, accepted by her, and delivered to the drawer.

The drawer of the draft transferred it to the Oswego State Bank, a Kansas banking corporation, for a valuable consideration, before maturity, which bank is plaintiff in this suit.

The defendant refused to pay the draft and this suit followed.

Defendant admits that she accepted the draft, but denies liability, and sets up various grounds of defense, the chief of which is that subsequent to the acceptance of the instrument sued on she, through an arrangement with the drawer of the draft, accepted another one, for the same amount, which was substituted for the original, which substituted draft was paid by her at maturity to the plaintiff bank; that the second or substituted draft was delivered by the drawer to the plaintiff bank to take the place of the original which had been transferred to plaintiff for value, and that her payment of the second draft to plaintiff satisfied her obligation.

There was judgment for the plaintiff and defendant appealed.

## OPINION

The defendant purchased a carload of flour from the Pearl Roller Mill Company, of Oswego, Kansas, the consideration being $1757.85.

On January 2, 1924, the Pearl Roller Mill Company drew two drafts on defendant, payable to its order, one for $876.00, payable February 1, 1924, and one for $881.85, payable on March 3, 1924; the two drafts covering the amount due for the flour.

These drafts were forwarded to the First National Bank of Shreveport, Louisiana, to be presented to Mrs. L. M. Maurer for acceptance and delivery to the drawer.

She accepted them promptly, and they were returned to the mill company.

Upon receipt of the drafts, the Pearl Roller Mill Company transferred them to the plaintiff bank, the bank paying therefor the face of the drafts, less a discount of 8% and one-tenth of 1% exchange.

This transfer took place previous to the maturity of the drafts, and without any knowledge on the part of the bank that the drafts were subject to any defect or infirmity; so that the bank was a holder in due course.

The drafts seem to have gone into the hands of the bank on January 14, 1924.

Two days later, on January 16, 1924, the defendant, Mrs. Maurer, wrote the Pearl Roller Mill Company as follows:

"We note that you have dated acceptances from date flour was shipped out of Oswego, Jan. 2d. We expected to date these from date car was received which was Jan. 12th and have made our arrangements accordingly. As a great favor to us, will you arrange with the First National Bank to re-date this paper 30 and 60 days from arrival date, making it Feb. 12th and March 12th. Thanking you to give this matter attention, and for courtesies already extended, we are,

"Yours very truly."

On January 19, 1924, the Pearl Roller Mill Company wrote Mrs. Maurer as follows:

"Replying to your favor of recent date, we note that you wish to have your papers that are due February 1st and March 3rd made payable 30 days after arrival of car, and as these papers are out of our hnds at the present time, we are making up a new set of acceptances, one for $876.00 due February 12 and one for $881.85 due March 12; these taking care of your car of flour and also giving you the additional time on same. We are sending these papers through the bank to the First National Bank of Shreveport, and would ask you to please sign same when presented, as in this manner we can give you the additional time that you desire; and in the meantime we will have your other papers recalled and will mail to you when received here."

The new or substituted drafts were dated January 19th, 1924, one due February 12th and the other March 12th, 1924, and are for the identical amounts as the originals. These drafts were presented to Mrs. Maurer by the First National Bank of Shreveport, accepted by her and by the bank delivered to the drawer or sent to the Oswego State Bank, the testimony not making this point clear.

On February 1st, 1924, one of the original drafts, the one for $876.00, due on that date, was presented to Mrs. Maurer for payment by the First National Bank of Shreveport. She refused payment on the ground that a new draft had been substituted for this one. The draft was protested and returned.

On February 9, 1924, the Pearl Roller Mill Company wrote Mrs. Maurer as follows:

"We find that the bank has protested your paper which was due February first and for which we have received other papers. We had instructed our bank to recall this paper but through some oversight they failed to do so, and we have absorbed this protest fee ourselves and are herewith enclosing you the paper marked 'renewed'. Regretting the error, and awaiting your further favors, we are,

"Yours truly."

The protested draft was forwarded to Mrs. Maurer marked on its face "renewed".

On February 12, 1924; the new or substituted draft for $876.00, dated January 19, 1924, and due February 12, 1924, was paid by Mrs. Maurer through the First National Bank of Shrevevport and the draft delivered to her.

On March 12, 1924, the new or substituted draft for $881.85, dated January 19, 1924, and due March 12, 1924, was likewise paid by Mrs. Maurer through the First National Bank of Shrevevport and delivered to her.

Notwithstanding the promise of the Pearl Roller Mill Company in its letter of January 19, 1924, that:

"We will have your other papers recalled, and will mail to you when received here,"

and the statement in the letter of February 9, 1924, that:

"We had instructed our bank to recall this paper (referring to the original draft) but through some oversight they failed to do so,"

the original draft for $881.85, dated January 2, 1924, and due March 3, 1924, was never returned to Mrs. Maurer.

But, long after this draft was due and long after the new or substituted draft was due and paid, or, on June 23, 1924, the plaintiff bank wrote Mrs. Maurer as follows:

"We have today sent to the First National Bank, your city, your trade acceptance to the Pearl Roller Mill Company, $881.85, due March 3. If this is not paid upon presentation, it will be necessary for us to turn it over to an attorney for collection."

This was the first intimation Mrs. Maurer had that this draft was outstanding and had not been recalled and taken back by the Pearl Roller Mill Company.

In the meantime the Pearl Roller Mill Company had gone out of business, and the plaintiff bank had gone into the hands of a receiver.

The defendant, having refused to pay the draft, this suit followed on July 26, 1924.

Plaintiff's theory and contention is that the draft sued on was acquired by it in due course and has not been paid.

If that be true, defendant is liable.

It is conceded that defendant acted in good faith all through, that she paid the debt for which she was bound; and counsel for plaintiff, in oral argument before this court, stated that to force her to pay the amount sued for will work a great hardship upon her; but he justifies the suit upon the technical ground that plaintiff is the holder of a negotiable instrument in due course which has not been paid, and that defendant is in law cut off from all equities.

The District Judge held with the plaintiff, and, in the course of a written opinion, he said:

"This is merely another case of too much trust. Mrs. Maurer is undoubtedly the sufferer, but it is a situation which she has brought upon herself by signing duplicate drafts, knowing at the time that the other drafts were outstanding and were negotiable."

We were, at first, much impressed by the argument of counsel for the plaintiff and the conclusion of the learned District Judge, but a thorough consideration of the record has convinced us that the plaintiff cannot recover under the testimony adduced.

Citation of authority is unnecessary to support the proposition that the maker of negotiable instruments is cut off from all equities as between himself and the original holder, when such instruments have passed into the hands of third persons in due course.

But it is also true that once such instruments have been paid by the maker to such third person it is discharged.

And that is what took place here.

The plaintiff unquestionably became the holder of the draft sued on and its companion draft, in due course. It paid full value therefor to the Pearl Roller Mill Company on January 14th. On that date Mrs. Maurer owed the amount represented by the draft. She was bound to pay the draft in the hands of the holder, regardless of any equities which may have existed between her and the Pearl Roller Mill Company.

The Pearl Roller Mill Company transferred the plaintiff its· interest in the drafts. The bank, upon the purchase of the drafts from the mill company, became the creditor of Mrs. Maurer for the amount thereof, and no more. The bank's only right against her was to force payment of the drafts. It follows necessarily that if the debt represented by the drafts has been paid by defendant to plaintiff, it has no right to pursue her further.

We find that the testimony shows that the· debt has been paid by defendant.

The testimony of J. W. Marley, taken by commission, is that he was cashier and vice-president of plaintiff bank in January, 1924, and that the discount register of the bank shows that on January 14, 1924, the draft for $881.85, due March 3, 1924, this being the draft sued on, as well as the companion draft of $876.00, due February 1, 1924, were discounted by the bank.

These were the original drafts executed by defendant, and were taken over by the bank from the Pearl Roller Mill Company.

There is no testimony to show, and, in fact, no intimation, that the plaintiff bank ever purchased from or discounted for the mill company any other draft executed by defendant. He specifically states that he knew nothing of any other draft having been purchased by the bank and that the records and books of the bank show no transaction with reference to the second set of drafts.

Mr. Marley was the one man, and the only man who testified in the case who was in position to know what transactions had taken place between the mill company and the bank. He testified that he personally handled the bills of exchange with the mill company.

We accept his testimony, therefore, as proof that the bank acquired only the original drafts and did not acquire by discount or otherwise the substituted or second drafts.

And yet the unchallenged and indisputable testimony is that both of the second or substituted drafts, which were identical with the first ones, except as to date, went through the mill company into the hands of the plaintiff bank and were paid to it by Mrs. Maurer, the debtor.

Now if, as is shown by the testimony, the plaintiff did not acquire by discount or purchase of the mill company the second or substituted drafts,· upon what basis or theory did it hold and collect them?

As above stated, it is undisputed that the new or substituted drafts were held and collected by the plaintiff bank.

The only rational conclusion is that when the mill company received the new

drafts it delivered them to the plaintiff bank to take the place of the first ones, and that as the mill company had accepted the new drafts as substitutes for the old ones the plaintiff bank accepted them from the mill company for the same purpose.

In other words, the new drafts were accepted by the bank to take the place of the old ones.

As evidence of this fact, the plaintiff bank made no protest when the defendant refused to pay the draft for $876.00 dated January 2, 1924, and due February 1, 1924, notwithstanding it had forwarded same to Shreveport for collection.

But, on the contrary, it forwarded to the same bank for collection the new draft for the same amount, which was paid by the debtor, and the proceeds remitted to it. When the other new draft, for $881.85, fell due, it was likewise sent to Shreveport for collection and paid by the debtor and the proceeds remitted by the collecting bank to plaintiff.

We note that the new drafts, both of which were collected by plaintiff, were presented for payment and were paid on the very date they were due, which is shown by the stamp of the collecting bank.

We note, also, that the original draft for $876.00, payment of which was refused, was presented for payment on the date it was due.

We note, further, that Mr. Marley, cashier of the plaintiff bank, testified that the bank always sent out these items for collection several days before they were due.

It being the bank's custom to send out these items for collection several days before they were due, which custom is shown both by the fact that they did so send them out and by the testimony of Mr. Marley, how did it happen that the draft sued on remained in the hands of plaintiff three months and twenty days after its maturity before any demand was made for its payment?

No attempt was made by plaintiff to explain this delay.

It takes no stretch of the imagination to conclude that when the bank collected the new drafts and credited the proceeds to the mill company's account, its claim had been paid, the transaction closed, and it pursued Mrs. Maurer no further.

The officers of the bank understood the situation.

But subsequently, the exact date not being shown, the bank went into the hands of a receiver, and it was the receiver, J. R. Stallings, who resurrected the old draft and brought suit to collect it.

We have no doubt that the failure to surrender the draft sued on when the others were received was due to an oversight on the part of the officers of the bank.

Let us note another instance which stands out in the record.

The plaintiff bank acquired the original drafts on January 14, 1924. The second or new drafts were dated January 19, 1924, and were promptly forwarded to the mill·

company. The new drafts were endorsed in blank, precisely as the first ones were, and were promptly delivered to the bank by the mill company; as they bear the bank's endorsement on January 31, 1924, we assume that they were delivered to the bank on that date.

The first of the original drafts to mature was due on February 1, 1924, and had already been forwarded for collection.

We think the inference is clear enough that when these second drafts were delivered to the plaintiff on January 31, 1924, the mill company instructed the bank to recall the draft which it had already sent out for collection, for the mill company wrote Mrs. Maurer, on February 9, 1924, as follows:

"We had instructed our bank (referring to the plaintiff) to recall this paper, but through some oversight they failed to do so."

In a previous letter, dated January 19, 1924, the mill company had written Mrs. Maurer that the original papers were out of its hands but that upon receipt of the new drafts—

"We will have your other papers recalled and will mail to you when received here."

There is no question but that plaintiff bank had full knowledge of the transactions between Mrs. Maurer and the mill company.

In the mill company's letter to Mrs. Maurer it said:

"We are sending these papers through the bank to the First National Bank of Shreveport."

While there is other testimony in the record as to who forwarded the second drafts to the First National Bank of Shreveport for Mrs. Maurer's acceptance, yet from the statement in the mill company's letter to the effect that they were forwarded through the bank, we accept it as a fact that the plaintiff bank forwarded the papers.

In the absence of any testimony to the contrary, we must assume that there was no controversy between the mill company and the bank and that the bank was willing to accept the new drafts in lieu of the old ones, or at least was willing to surrender them.

But the patent fact as disclosed by the record is that plaintiff purchased from or discounted for the mill company only two drafts, one for $876.00 and the other for $881.85.

These identical items of indebtedness have been collected by the plaintiff bank from Mrs. Maurer, the defendant, and her obligation to the bank therefor discharged.

The testimony of Mr. Marley, who was cashier and vice-president of the bank at the time these transactions took place, was specific that the bank purchased from the mill company only two drafts, and that he knew nothing whatever about the second set of drafts.

So that, if in fact the new or second set of drafts were not taken in lieu of the first drafts, the plaintiff paid no consideration whatever for the second drafts.

And yet the testimony is that the plaintiff bank collected the second set of drafts.

33  La. App.

Plaintiff introduced in evidence two sheets purporting to be copies of the discount record of the plaintiff bank.

If these records prove anything, they put plaintiff out of court. Let's see.

Sheet marked "Plaintiff's 2-A" shows the following with reference to the draft sued on:

"Date of Draft—1-2-24.
"Our No.—541.
"Drawer or Maker—Shreveport Bakery & L. M. Maurer.
"Where Payable—P. R. Mill Co.
"When Discounted—1-14-24.
"When Due—3-3-24.
"Amount—$881.85."

Above these notations, written on the sheet, is the following certificate:

"State of Kansas.
"Labette County.

"I, John E. Wagner, assistant receiver of the Oswego State Bank, of Oswego, Kansas, hereby certifies that the following is a true and correct copy of the Discount Register of said bank, as it pertains to the item of the Shreveport Bakery, amount $881.85, now being litigated."

This certificate is sworn to by Mr. Wagner.

As is indicated by the dates, this is one of the original drafts.

On sheet marked "Plaintiff's 2-2" is the following:

"Date of Draft—1-19-24.
"Our No.—542.
"Drawer or Maker—Shreveport Bakery, L. M. Maurer, Prop.
"Where Payable—P. R. Mill Co.
"When Discounted—1-29.
"When Due—3-12-24.
"Amount—$881.85."

Following this record entry and written on the same sheet is the following sworn certificate:

"State of Kansas.
"Labette County.

"I, John E. Wagner, assistant receiver of the Oswego State Bank of Oswego, Kansas, hereby certifies that the above is a true and correct copy of the Discount Register of said bank as it pertains to the item of the Shreveport Bakery, amount $881.85, now being litigated."

This refers to one of the second drafts.

The two drafts referred to are identical, except as to dates. Wagner refers to each as "now being litigated". But they are not each being litigated. It is only the first draft, dated January 2, 1924, due March 3, 1924, which is in litigation.

So that if Wagner's certificates prove anything, they prove that the two drafts evidence one item of indebtedness, $881.85, the amount "now being litigated". His certificates are identical as to each draft. He refers to each as "now being litigated".

If Wagner's understanding is correct, that is, that the two drafts were given to evidence the same item of indebtedness (and that is unquestionably true) the plaintiff is in a bad plight before the court, for it is undisputed that the defendant's debt to the bank of $881.85 was paid on March 12, 1924, long before the suit was filed.

Where, as in this case, two instruments are given to evidence the same debt, the holder of them who has knowledge of that fact and who has, as in this case, given consideration for only one of them, can collect one but not both.

The testimony and all the circumstances, viewed as a whole, show that the plaintiff had knowledge when it accepted the new drafts from the mill company that they were given as substitutes for the first ones.

It paid no consideration for the new drafts, but accepted them in lieu of the first ones.

Having collected the new drafts, under such circumstances the old ones were dead instruments.

Of course, if the plaintiff bank had become the holder of both sets of drafts for a valuable consideration before maturity, the case would be different; but there is no testimony that the plaintiff was the holder of both sets of drafts in due course, in the sense that it paid consideration for each of them.

The testimony satisfies us, taking into consideration all the circumstances, that the bank had full knowledge of the fact that the mill company had taken the second drafts as substitutes for the first ones, and that, as a matter of fact, the first drafts were without consideration.

Plaintiff's suit is without merit.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be reversed and plaintiff's suit dismissed at its cost in both courts.